# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| INTEAM ASSOCIATES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 11523-VCMR |
| | ) | |
| HEARTLAND PAYMENT SYSTEMS, INC., a Delaware corporation, | ) ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| HEARTLAND PAYMENT SYSTEMS, INC., | ) ) | |
| | ) | |
| Counterclaim Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LAWRENCE GOODMAN, III, and INTEAM ASSOCIATES, LLC, | ) ) | |
| | ) | |
| Counterclaim Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted:  June 10, 2016
Date Decided:  September 30, 2016

Thad J. Bracegirdle and Andrea S. Brooks, WILKS, LUKOFF & BRACEGIRDLE, LLC, Wilmington, Delaware; *Attorneys for Plaintiff and Counterclaim Defendants*.

Jeffrey L. Moyer, Travis S. Hunter, and Arun J. Mohan, RICHARDS LAYTON & FINGER, P.A., Wilmington, Delaware; *Attorneys for Defendant and Counterclaim Plaintiff*.

**MONTGOMERY-REEVES, Vice Chancellor.**

In this action, two Delaware entities, inTEAM Associates, LLC ("inTEAM") and Heartland Payment Systems, Inc. ("Heartland"), that own K-12 school meal management software each assert breach of contract claims against the other. inTEAM's predecessor, School Link Technologies, Inc. ("SL-Tech"), and Heartland entered into a transaction in which Heartland bought substantially all of SL-Tech's assets. The transaction was detailed in three agreements that were executed together and work in tandem. These agreements contain various non-competition, non-solicitation, exclusivity, and cross-marketing and support obligations.

inTEAM alleges that Heartland breached its non-competition obligations as well as its cross-marketing and support obligations. Heartland claims that inTEAM breached its reciprocal non-competition covenant, and inTEAM's chief executive officer breached his non-solicitation and non-competition obligations.

In this post-trial Memorandum Opinion, I hold that inTEAM did not breach any of its contractual obligations. Heartland, however, breached its non-competition and exclusivity obligations, and inTEAM's chief executive officer breached certain of his non-solicitation provisions. No affirmative defense excuses any of the breaches. As a result, both inTEAM and Heartland are entitled to relief.

1

## I.   BACKGROUND

These are my findings of fact based on the parties' stipulations, documentary evidence, and testimony of eight witnesses during a four-day trial. I accord the evidence the weight and credibility I find it deserves.[1]

### A.   Parties and Relevant Non-Parties

inTEAM is a Delaware limited liability company with its principal place of business in Santa Monica, California.[2]  inTEAM operates "in the USDA-driven, funded state and local school district child nutrition programs, primarily in K through 12 schools," offering "consulting services, training services and technology at both the state and school district level."[3]  Before the parties' execution of the Asset Purchase Agreement, dated September 12, 2011 (the "Asset Purchase Agreement"), inTEAM was a division of SL-Tech.

SL-Tech "develop[ed], manufacture[d], [sold], service[d] and maintain[ed] computer software and POS terminal hardware" that was "designed to facilitate (i)

---

[1]   Citations to testimony presented at trial are in the form "Tr. # (X)" with "X" representing the surname of the speaker, if not clear from the text. After being identified initially, individuals are referenced herein by their surnames without regard to formal titles such as "Dr." No disrespect is intended. Exhibits are cited as "JX #," and facts drawn from the parties' Joint Pre-Trial Stipulation and Order are cited as "PTO ¶ #." Unless otherwise indicated, citations to the parties' briefs are to post-trial briefs.

[2]   PTO ¶ III.A.1.

[3]   Tr. 11-12 (Goodman).

accounting and (ii) reporting of transactional data functions and management of food service operations of K-12 schools (including point-of-sale operations, free and reduced application processing, ordering and inventory, menu planning and entry of meal and other payments by parents via the Internet or kiosk)."[4]

Chip Goodman is the Chief Executive Officer (the "CEO") of inTEAM and, prior to the parties' execution of the Asset Purchase Agreement, was the CEO and "Major Shareholder" (as defined in the Asset Purchase Agreement) of SL-Tech.[5] Janet Luc Griffin is the Director of Business Development at inTEAM and is the contact person for state agency deals, provides consulting services for districts and state agencies, and reviews software implementation.[6] Lei Ditch is the Director of Technology at High5LA, LLC, formerly Startech Global Corporation ("Startech"), who was hired by SL-Tech to help develop their software products.[7]

Heartland is a Delaware corporation with its principal place of business in Princeton, New Jersey.[8] Heartland is a credit card payment processor for various

---

[4]     PTO ¶ III.A.6 (citing JX 25 at 1).

[5]     *Id.* ¶ III.A.3.

[6]     Tr. 361-62 (Griffin).

[7]     Tr. 481-84 (Ditch).

[8]     PTO ¶ III.A.2.

industries, including K-12 schools.[9]  Heartland also offers computer software products designed to help customers manage school meal programs for the K-12 foodservice industry in the United States.[10]  These products perform menu planning, create recipes, monitor inventory, process orders, analyze nutrients, generate production records, and facilitate USDA compliance.[11]

Michael Lawler currently serves as the President of the Strategic Markets Group for Heartland and is responsible for the School Solutions division, among others.[12]  Terry Roberts is the Senior Vice President of Heartland's School Solutions division; he served as SL-Tech's Chief Operating Officer ("COO") before its acquisition by Heartland.[13]  Tyson Prescott is the Director of Research and Development for Heartland and was a software development manager at SL-Tech before its acquisition by Heartland.[14]

---

[9]     Tr. 611-12 (Lawler).

[10]     *Id.*

[11]     *Id.* at 618.

[12]     *Id.* at 608-11.

[13]     Tr. 982-83 (Roberts).

[14]     Tr. 789-90 (Prescott).

**B.     Facts**

The federal government provides funding to schools that participate in and comply with certain meal nutrition programs for students.[15] The United States Department of Agriculture (the "USDA") issues national regulations for these meal nutrition programs, and state agencies monitor compliance with the regulations through an administrative review process.[16] As part of these programs, the federal government subsidizes meals at various rates that are set each year.[17]

Until 1977, the regulations focused on four menu "components:" meat, vegetables/fruits, grains, and milk.[18] By the 1990s, the focus shifted to certain nutrient targets, and the government introduced Nutrient Standard Menu Planning, which required schools to keep track of extensive nutrition information for various food offerings.[19] This spurred the development of software programs to assist schools in managing this information. The USDA approves software programs

---

[15]     DOROTHY PANNELL-MARTIN & JULIE A. BOETTGER, SCHOOL FOOD & NUTRITION SERVICE MANAGEMENT FOR THE 21ST CENTURY 5 (6th ed. 2014).

[16]     *Id.* at 6-8.

[17]     *Id.* at 13 (showing base rates for SY2014 are $0.34 for paid lunch, $2.59 for a reduced-price lunch, and $2.99 for a free lunch).

[18]     *Id.* at 77.

[19]     *Id.*

that perform the required "nutrient analysis."[20]  This software, Nutrient Analysis Software Approved for Nutrient Analysis Required in the School Meal Programs ("Nutrient Analysis Software"),[21] analyzes calories, saturated fat, sodium, protein, Vitamin A, total fat, dietary fiber, carbohydrates, water, and iron, among other nutrients, either by utilizing manual data entry of all menu items or by retrieval of nutrient data from an approved database.[22]

In 2010, the federal government promulgated the Healthy, Hunger-Free Kids Act of 2010 (the "HHFKA").[23]  Later that year, the Institute of Medicine's Committee on Nutritional Standards for National School Lunch and Breakfast Programs, of which inTEAM consultant Mary Jo Tuckwell was a member, issued new recommendations for changes to related USDA regulations (the "IOM Report").[24]  The IOM Report suggested an integration of the pre-1977 menu-component model with the 1990s nutrient-focused model, which would emphasize

---

[20]  JX 400.

[21]  *Id.*

[22]  Tr. 910 (Fox); JX 400.

[23]  42 U.S.C. § 1751 *et seq.*; PANNELL-MARTIN & BOETTGER, *supra* note 15, at 78-80.

[24]  INST. OF MED. OF THE NAT'L ACADS. COMM. ON NUTRITION STANDARDS FOR NAT'L SCH. LUNCH AND BREAKFAST PROGRAMS, SCHOOL MEALS: BUILDING BLOCKS FOR HEALTHY CHILDREN v, 194-95, 235 (2010), http://www.fns.usda.gov/sites/default/files/SchoolMealsIOM.pdf; JX 248, at 1.

6

food-based menu planning and deemphasize nutrient analysis.[25] The USDA followed these recommendations and issued proposed rule changes on January 13, 2011 that stated, "nutrient-based menus will be eliminated and only food-based menu planning will be permitted . . . ."[26] The new regulations create five main food groups (meat/high protein foods, whole grains, vegetables, fruit, and fat-free/low-fat milk), which have specified subcategories and nutrient targets for calories, saturated fat, trans fat, and sodium.[27]

Under the HHFKA, the USDA also introduced performance-based funding to foster compliance with the new meal standards.[28] Currently, a school district may receive an additional six cents per reimbursable meal if it complies with the meal pattern requirements promulgated under the HHFKA ("six cent

---

[25]   INST. OF MED. OF THE NAT'L ACADS. COMM. ON NUTRITION STANDARDS FOR NAT'L SCH. LUNCH AND BREAKFAST PROGRAMS, *supra* note 24, at 194-95 ("[The] USDA could consider . . . approaches [that] would move away from the current emphasis on completing nutrient analysis and documenting compliance. The initial approach might address fewer elements at a time but occur on a more frequent basis. . . . Focusing on Meal Requirements rather than the Nutrient Targets in planning and assessing school meals fits with the goals of both CRE and SMI reviews."); JX 58, at 4-5; Tr. 58 (Goodman).

[26]   Nutrition Standards in the National School Lunch and School Breakfast Programs, 76 Fed. Reg. 2494, 2536 (proposed January 13, 2011).

[27]   PANNELL-MARTIN & BOETTGER, *supra* note 15, at 78, 80-81.

[28]   JX 321, at 12.

7

certification").[29]  The governing state authority must make an initial certification determination and, thereafter, monitor each school district's ongoing compliance with meal pattern requirements through administrative reviews that occur every three years.[30]

In 2012, the USDA provided three options to school districts to submit information to their state agencies for six cent certification.  Option 1 involved submitting menus, a USDA worksheet, and a nutrient analysis.[31]  This option allowed school districts that already owned Nutrient Analysis Software for their other needs to use it towards six cent certification as well.  Option 2 allowed districts to submit menus, the USDA worksheet, and a Simplified Nutrient Assessment in lieu of nutrient analysis.[32]  The Simplified Nutrient Assessment only analyzes calories, saturated fat, and sodium.[33]  It does not require the data entry of all menu items or the use of a nutrient database.[34]  School districts using this option could purchase another category of USDA-approved software, called Menu

---

[29]    *See* PANNELL-MARTIN & BOETTGER, *supra* note 15, at 43; *see also* 42 U.S.C. § 1753(b)(3)(C)(i) & (D).

[30]    *See* JX 401, at 5.

[31]    *Id.* at 10.

[32]    *Id.* at 12.

[33]    *Id.*

[34]    *Id.*

Planning Tools Approved for Certification for Six Cent Reimbursement ("Menu Planning Tools"),[35] which performs the necessary functions under this option. Under Option 3, the state agency would conduct an on-site review.[36]

### 1. The parties prior to the transaction

Prior to the transaction, SL-Tech owned software and hardware to help K-12 schools monitor their food service operations' compliance with applicable regulations.[37] Three of these products are relevant in this dispute: WebSMARTT, mylunchmoney.com ("MLM"), and the Decision Support Toolkit ("DST"). WebSMARTT, a USDA-approved Nutrient Analysis Software, provided the end-to-end functionality to allow schools to monitor children's nutrition in school meals.[38] WebSMARTT encompassed point of sale, free and reduced meal eligibility tracking, menu planning, nutrient analysis, and production records functionalities.[39] MLM, a proprietary online payment-processing product, had approximately 10,000 schools as users.[40]

---

[35] Tr. at 393-94 (Griffin); JX 400.

[36] Tr. at 393-94 (Griffin).

[37] PTO ¶ III.A.6 (citing JX 25, at 1); Tr. 20-22 (Goodman).

[38] Tr. 793-94 (Prescott).

[39] *Id.*

[40] JX 12.

9

In 2007, SL-Tech began building DST Phase 1 as a prototype, and in 2009, SL-Tech engaged Startech to develop and write the functional design documents for the full software product, DST Phase 2, which SL-Tech published on January 11, 2011 (the "Functional Design Documents").[41] In Phase 1, DST developed data analytics of sales and meal count data.[42] In Phase 2, DST would become cloud-based software that would allow schools and districts to menu plan and project the menus' effects on staffing, equipment, and other costs, and state administrators would be able to view this data simultaneously.[43]

SL-Tech also owned inTEAM, which was a "15-year-old management consulting company known historically for its hands-on workshops in financial management for school nutrition programs."[44] Additionally, inTEAM provided "comprehensive assessments of school nutrition programs."[45]

Heartland primarily acted as a credit card processor that provided terminals and software to enable merchants to accept credit cards.[46] In 2010, Heartland

---

[41]     Tr. 487-90 (Ditch).

[42]     Tr. 30 (Goodman).

[43]     *Id.* at 33, 54.

[44]     JX 58, at 4.

[45]     *Id.*

[46]     Tr. 611-12 (Lawler).

began entering the K-12 school market because it "saw an opportunity [to] acquir[e] these companies that provided [] food management software."[47] Owning these products would allow Heartland to make money when the parents of students used their credit cards to pay for their children's lunches.[48] This strategy became the Heartland School Solutions division.[49]

### 2. The transaction

As part of their new School Solutions strategy, Heartland approached SL-Tech about a potential acquisition.[50] Goodman prepared an "Outline of Key Terms" in April 2011.[51] Goodman proposed that Heartland pay $17 million at closing (representing 60% of a "low-end valuation" of SL-Tech) plus earn-out payments (calculated as a percentage of a multiple of gross profit or EBITDA realized by Heartland) on each of the first five anniversaries of closing to compensate SL-Tech for the remaining 40% of the value of the company.[52] In addition, Goodman would become CEO of Heartland's School Solutions

---

[47] *Id.*

[48] *Id.* at 613.

[49] *Id.* at 612-13.

[50] Tr. 738 (Lawler); Tr. 60 (Goodman).

[51] Tr. 62 (Goodman).

[52] JX 9, at 3.

11

business.[53]   Heartland, however, did not want inTEAM's consulting business, including DST, which it felt was outside their strategy of "acquiring companies that provided the point-of-sale solutions to K through 12" schools.[54]

Eventually, the two companies agreed that Heartland would purchase substantially all of SL-Tech's assets, excluding the "inTEAM Business," among others.[55]   Goodman would remain the owner and CEO of inTEAM as a separate legal entity, and he would serve as a consultant to Heartland.[56]   The parties effectuated the transaction through the execution of three agreements: the Asset Purchase Agreement, the Co-Marketing Agreement, dated September 30, 2011 (the "Co-Marketing Agreement"), and the Consulting Agreement, dated September 30, 2011 (the "Consulting Agreement").   These agreements contain non-competition, non-solicitation, exclusivity, and cross-marketing and support obligations that form the basis of the alleged breaches here.

### a.   The Asset Purchase Agreement

On September 12, 2011, SL-Tech (the "Seller"), Heartland (the "Buyer"), Goodman (the "Major Shareholder"), and other shareholders (the "Seller

---

[53]   Tr. 65-66 (Goodman).

[54]   Tr. 614 (Lawler).

[55]   JX 25 ("Asset Purchase Agreement") Exs. A-4, M.

[56]   JX 13, at 3-5.

Shareholders") executed the Asset Purchase Agreement.[57]    Under the Asset

Purchase Agreement, Heartland acquired WebSMARTT and MLM, among other

assets, for $17 million.[58]

### i.    The non-competition provision

The Asset Purchase Agreement's covenant not to compete states in relevant

part as follows:

> For a period of five (5) years from and after the Closing
> Date, neither Seller nor the Major Shareholder will
> engage directly or indirectly, on Seller's or the Major
> Shareholder's own behalf or as a Principal or
> Representative of any Person, in providing any
> Competitive Services or Products or any business that
> School-Link conducts as of the Closing Date in any of
> the Restricted Territory . . . .[59]

Thus, this non-competition provision prohibits SL-Tech and Goodman from

engaging, directly or indirectly, on their own behalf or on behalf of any Person, in

providing (1) any Competitive Services or Products, or (2) any business that

School-Link conducts in the United States as of September 30, 2011.

The Asset Purchase Agreement defines "Competitive Services or Products"

and "School-Link" as follows:

---

[57]    Asset Purchase Agreement at 1.  The deal closed on September 30, 2011.  *Id.* at 4.

[58]    PTO ¶ III.B.4-5.

[59]    Asset Purchase Agreement § 5(n), Ex. A. (defining "Restricted Territory" as the United States).

> "*Competitive Services or Products*" means a business that develops, manufactures, sells and services and maintains computer software and/or POS terminal hardware designed to facilitate (i) accounting and (ii) management and reporting of transactional data functions, of food service operations of K-12 schools (including point-of-sale operations, free and reduced application processing, ordering and inventory, and entry of meal and other payments by parents via the Internet or kiosk); *provided, however*, that for purposes of clarity, Competitive Services or Products shall not include the inTEAM Business as currently conducted.
>
> . . . .
>
> "*School-Link*" means the entirety of Seller's business, including the business of Seller known as "School-Link," but excluding the inTEAM Business.[60]

Hence, the Asset Purchase Agreement's non-competition provision excludes the "inTEAM Business" from the scope of prohibited activity (the "inTEAM Carve-Out").

The Asset Purchase Agreement defines "inTEAM Business" as follows:

> "*inTEAM Business*" means certain Excluded Assets consisting of Seller's consulting, e[L]earning and DST segments of the business known as "inTEAM" and including those products and services described in Exhibit C to the Co-Marketing Agreement.[61]

Accordingly, the non-competition obligations of SL-Tech and Goodman under the

Asset Purchase Agreement are limited by and understood with reference to a

---

[60] Asset Purchase Agreement Ex. A-1, A-8.

[61] Asset Purchase Agreement Ex. A-4.

14

carve-out defined therein and further described in Exhibit C of the Co-Marketing Agreement.[62]

### ii.      The non-solicitation provision

The Asset Purchase Agreement also contains a non-solicitation provision stating:

> For a period of five (5) years from and after the Closing Date, none of Seller or any Seller Shareholder will directly or indirectly, on Seller's or such Seller Shareholder's own behalf or as a Principal or Representative of any Person, solicit, divert, take away or attempt to solicit, divert or take away a Protected Customer or a Referral Source in any of the Restricted Territory for the purpose of providing Competitive Services or Products.[63]

The Asset Purchase Agreement goes on further to define "Protected Customer" as follows:

> (a) any Person to whom Seller sold, licensed or leased its products or services at any time during the twelve (12) month period ending on the Closing Date and (b) any Person that at any time during the twelve (12) month period ending on the Closing Date, Seller (i) provided a written price quote to or (ii) discussed with in writing other material terms.[64]

---

[62]      *See infra* Section I.B.2.b.i.

[63]      Asset Purchase Agreement § 5(o).

[64]      *Id.* Ex. A-7.

Thus, neither SL-Tech nor any shareholder of SL-Tech may solicit any Protected Customer or Referral Source in the United States in order to provide any Competitive Product or Service on or before September 30, 2016.[65]

### b. The Co-Marketing Agreement

The Co-Marketing Agreement grants both Heartland and SL-Tech the right to market one another's products.[66] inTEAM assumed and was assigned all of SL-Tech's rights under the Co-Marketing Agreement through an Assignment and Assumption Agreement, dated October 31, 2011.[67]

### i. The non-competition and exclusivity obligations

Similar to the Asset Purchase Agreement, the Co-Marketing Agreement provides that during the five years following closing, "inTEAM shall not engage, directly or indirectly, on its own behalf or as a principal or representative of any person, in providing any services or products competitive with the HPS Business."[68] In the same provision, Heartland grants a reciprocal covenant, which states,

---

[65] *See supra* Section II.B.1.a.i. for further definitions of Restricted Territory and Competitive Services and Products.

[66] JX 23 ("Co-Marketing Agreement") § 2.1.

[67] PTO ¶ III.C.15.

[68] Co-Marketing Agreement § 9.1.1(B).

[Heartland] shall not engage, directly or indirectly, on its own behalf or as a principal or representative of any person, in providing any services or products competitive with the inTEAM Business, and [Heartland] hereby grants to inTEAM the exclusive right and license under any intellectual property of [Heartland] (other than trademarks) to conduct the inTEAM Business.[69]

The Co-Marketing Agreement further defines "HPS Business" and "inTEAM Business" as follows:

"HPS Business" means the development, manufacture, or sale of computer software and/or POS terminal hardware designed to facilitate (A) accounting and (B) reporting of transactional data functions and management of of [sic] food service operations of K-12 schools (including point-of-sale operations, free and reduced application processing, ordering and inventory, and entry of meal and other payments by parents via the Internet or kiosk).

. . . .

"inTEAM Business" means certain Excluded Assets consisting of inTEAM's consulting, eLearning and DST segments of the business known as "inTEAM" and including those products and services described in Exhibit A and those inTEAM products and services described in Exhibit C and Exhibit D.[70]

Thus, like the Asset Purchase Agreement, the Co-Marketing Agreement defines the inTEAM Business by reference to, among other things, products and services

---

[69]     *Id.* § 9.1.1.

[70]     *Id.* § 1.1.2.

17

described in Exhibit C, which the parties attached to the Co-Marketing Agreement.[71]

Exhibit C states in its entirety:

**Functional Specifications**

Functional specifications for DST Phase 1 and add-ons and DST Phase 2 (future release); including unique state value added functionality (attached)

Student Rewards functional specifications (attached)

Off Campus Merchants functional specifications (attached)[72]

Attached to the Co-Marketing Agreement, and incorporated by reference, are the functional specifications for DST Phase 1 and Phase 2 in the form of the Functional Design Documents.[73]

The two DST Phase 2 Functional Design Documents discussed at trial were "Milestone A – Menu Item"[74] and "Milestone B – Menu Planning."[75] These Functional Design Documents explain how DST utilizes core menu planning

---

[71]     *Id.* Ex. C.

[72]     *Id.*

[73]     *See, e.g.*, JX 3 (DST Phase 2 Functional Design, Milestone A – Menu Item, dated January 10, 2011); JX 4 (DST Phase 2 Functional Design, Milestone B – Menu Planning, dated January 11, 2011); JX 326.

[74]     JX 3.

[75]     JX 4.

concepts, such as "menu items," "menu categories," "menu templates," and "menu cycles."[76] Each represents a building block that a school district or state administrator would use to create and plan a menu.[77] Menu items (servings of a specific food) are grouped into menu categories (such as fruits, etc.) and combined to form menu templates (an arrangement of items comprising a single meal).[78] A menu cycle then aggregates menu templates for each day over a specific period of time (week, month, etc.).[79] Further, the Functional Design Documents show DST Phase 2 anticipates allowing the user to create, edit, copy, and save in each phase of menu planning.[80]

### ii. The termination provision

The Co-Marketing Agreement also contains a termination provision. Section 4.2.2 of the Co-Marketing Agreement states:

---

[76] Tr. 501-03 (Ditch); JX 3, at 7; JX 4, at 6.

[77] Tr. 501-02 (Ditch).

[78] *Id.*

[79] *Id.* at 502-03.

[80] *Id.* at 509-36; JX 3, at 8-12 (edit, save, and delete menu category, including create and input description), 20-25 (copy menu items), 29-30 (input and edit portion size and service unit for menu items); JX 4, at 19-22 (create new menu template), 23-27 (copy existing menu template), 29-35 (create, copy, and edit menu items to populate menu template), 36-39 (create new menu cycle and input menu cycle data), 40-41 (copy existing menu cycle), 47-48, 52-54 (drag and drop menu templates into menu cycles).

19

In the event that a Provider does not meet a Renewal Threshold applicable to a Product of the Recipient, the Recipient may terminate this Agreement with respect to the provision of such Product upon thirty (30) days' prior written notice to the Provider, provided that the Recipient must provide notice of termination within sixty (60) days after the applicable anniversary of the Effective Date. In the event of a termination of a product . . . (A) the corresponding obligations set forth in Section 2 and Section 3 shall cease to apply and (B) if the termination is a termination by HPS of Student Rewards or Off-Campus Merchants, the obligations set forth in Section 9.1, including, without limitation, the exclusivity and non-competition obligations therein, shall cease to apply with respect to Student Rewards or Off-Campus Merchants, as applicable.[81]

In other words, if for instance, inTEAM does not meet its Renewal Thresholds, which are sales targets, for a certain Heartland product, Heartland can terminate the Co-Marketing Agreement with respect to that product with thirty days' written notice.[82] Upon termination, the obligations in Sections 2 and 3 no longer apply.

### iii. The cross-marketing and support obligations

Section 2 of the Co-Marketing Agreement creates several cross-marketing and support obligations. The relevant portion of Section 2.4 provides:

As part of HPS Services, during the Term, HPS shall prominently display the Licensed Content provided by inTEAM on the MLM website and shall work in good faith with inTEAM to determine the commercial viability

---

[81]     Co-Marketing Agreement § 4.2.2.

[82]     *Id.*

of incorporating such Licensed Content into other K-12 payment center websites (with functionality similar to MLM) of HPS that are developed by such parties during the Term.[83]

"Licensed Content" is defined as "website content, promotional materials or campaign-related communications . . . includ[ing] only content developed or created by or for a Party that such Party delivers to the other Party and specifically designates in writing as Licensed Content."[84]  Thus, Heartland agrees to display inTEAM's Licensed Content on its MLM website, and Heartland also agrees to perhaps incorporate the content into other K-12 payment center websites.[85]

Section 2.5.2 incorporates by reference Section 4.2.2, the termination provision, and states:

> HPS shall provide inTEAM the customer lists and reseller lists pertaining solely to MLM and the Developed Websites (including updates to such lists that are made during the Term) of HPS and HPS Affiliates for the purposes of marketing and selling Student Rewards and Off-Campus Merchants to such customers and resellers.[86]

---

[83]    *Id.* § 2.4.

[84]    *Id.* § 5.2.1.

[85]    *Id.* §§ 2.4, 5.2.1.

[86]    *Id.* § 2.5.2.

Under this provision, Heartland is obligated to provide inTEAM with lists of parents and schools from MLM and any other Heartland K-12 payment center websites with functionality similar to MLM in order to allow inTEAM to market Student Rewards and Off-Campus Merchants.[87]

The parties also agreed to provisions governing the support of technology. The relevant language from Section 2.6 states:

> To the extent that performance or receipt of Services hereunder requires a Party to have access to the other Party's intranet or other computer software, networks, hardware, technology or computer-based resources ("Required Technology"), such other Party shall provide (or cause to be provided) limited access to such Required Technology . . . In no event shall a Party be obligated to provide such access beyond the limited access necessary to permit the other Party to perform or receive the Services as required under this Agreement.[88]

"Services" are defined as "inTEAM Services" and "[Heartland] Services." inTEAM Services are "subject to Section 4.2.2," and give inTEAM Parties "the right to market, advertise, and promote sales of the HPS Products."[89] Heartland Services are "subject to Section 4.2.2" and give Heartland Parties "the right to

---

[87]   *Id.* §§ 2.4, 2.5 (incorporating the definition of Developed Websites from Section 2.4.).

[88]   *Id.* § 2.6.

[89]   *Id.* § 2.1.

22

market, advertise, and promote sales and licenses of the inTEAM Products."[90] In other words, each party must allow the other party the minimum access to whatever necessary technology is required for them to perform their marketing and sales obligations under the agreement, but no more. These obligations are expressly subject to the termination provision.

Section 2.8 adds: "[p]arties shall use commercially reasonable best efforts to develop and maintain all applicable Products, related websites and related technology assets and ensure that the Products and related websites and technology assets are all integrated and interfaced . . . such that the products may be cross-promoted."[91]

### c. The Consulting Agreement

Under the Consulting Agreement, Goodman is to act as a "strategic advisor" to Heartland and as a "liaison with key industry stakeholders advancing Heartland's objectives."[92] In return, Goodman is to receive a monthly salary of $16,666.67.[93]

---

[90] *Id.* § 2.1.

[91] *Id.* § 2.8.

[92] JX 22 ("Consulting Agreement") ¶ 1.

[93] *Id*. ¶ 3.

### i.      The non-competition provision

The relevant non-competition language binds Goodman ("Consultant") as follows:

> During the Term of this Agreement and for two (2) years thereafter, the Consultant shall not directly or indirectly, on behalf of himself or on behalf of any other person, firm or business entity: (i) become an owner of any outstanding capital stock, or a member or partner, of any company, partnership, or entity that engages in, Competitive Business within the Restricted Territory; or (ii) perform or provide any services, whether as an employee, owner, consultant or otherwise, to, for or on behalf of any company, partnership, or entity that engages in Competitive Business within the Restricted Territory, if such services are the same or similar in character to the services performed or provided by the Consultant to Heartland pursuant to this Agreement. . . . For purposes of this Agreement, "<u>Competitive Business</u>" shall be defined as follows: developing, manufacturing, selling, servicing or maintaining computer software and/or POS terminal hardware designed to facilitate (i) accounting or (ii) management and reporting of transactional data functions of food service operations of K-12 schools (including point-of-sale operations, free and reduced application processing, ordering and inventory, entry of meal or other payments by parents via the Internet or kiosk); provided, however, for purposes of clarity, Competitive Business shall not include the inTEAM Business (as defined in the Asset Purchase Agreement) as conducted as of the effective date of the Asset Purchase Agreement.  For purposes of this Section 11, "Restricted Territory" shall be defined as the entire United States of America.[94]

---

[94]      *Id.* ¶ 11(a).

In other words, for five years[95] after the agreement's Effective Date on September 30, 2011, Goodman cannot directly or indirectly become an owner of any entity that does Competitive Business with Heartland, or perform or provide any services to an entity that engages in Competitive Business, in the entire United States of America. "Competitive Business" essentially refers to the same definition as "Competitive Services or Products" under the Asset Purchase Agreement, and it specifically carves out the inTEAM Business.[96] If Goodman provides services to a Competitive Business, he will only be in breach if such services are similar to those he is providing to Heartland.

### ii. The non-solicitation provision

The Consulting Agreement contains a non-solicitation provision that also binds Goodman. It states:

> During the Term of this Agreement and for two (2) years thereafter, the Consultant shall not directly or indirectly, on behalf of himself or on behalf of any other person, firm or business entity: (i) contact, solicit or do business with, or attempt to contact, solicit, or do business with, any Customer of Heartland for purposes of conducting any Competitive Business; or (ii) encourage or attempt to encourage any Customer of Heartland to terminate, or

---

[95]   The agreement's "Term" is three years following the effective date, Consulting Agreement ¶ 5, and the provision at issue adds "two (2) years thereafter," totaling five years. Consulting Agreement ¶ 11(b).

[96]   *See supra* Sections I.B.2.b.i, I.B.2.a.i.

materially and adversely modify, its relationship with Heartland or to cease or refrain from doing business with Heartland. "Customers" means all customers, clients, vendors, and suppliers, as well as any prospective customers, clients, vendors, and suppliers, of Heartland (or any of its subsidiaries or affiliated entities), and all customers, clients, vendors, and suppliers, as well as any prospective customers, clients, vendors, and suppliers, of Seller prior to the Effective Date. The non-solicitation provision in this Section 11 shall only apply to those Customers with whom the Consultant worked, or about whose business or needs the Consultant gained information, either in his capacity as an officer with Seller, or in his capacity as Consultant under this agreement.[97]

Goodman essentially cannot contact or attempt to contact any customer or prospective customer of Heartland for purposes of conducting Competitive Business, as defined in the corresponding non-competition provision, or encourage any customer of Heartland to terminate or modify its relationship with Heartland. The customer must be someone with whom Goodman worked or on whose business he gained information through his capacity at SL-Tech or his capacity as consultant for Heartland.

### 3. Post-transaction occurrences

After the closing of the transaction, the parties began working together under the new arrangement. But this co-existence was short lived and unsuccessful.

---

[97] Consulting Agreement ¶ 11(b).

### a. The parties execute memoranda of understanding and launch KidsChoose

Shortly after executing the Asset Purchase Agreement and Co-Marketing Agreement, Heartland and inTEAM executed a Memorandum of Understanding dated November 29, 2011 (the "2011 MOU") and a supplemental Memorandum of Understanding dated February 10, 2012 (the "2012 MOU").[98] The 2011 MOU clarified inTEAM's ability to develop a state-level Meal Benefits Management System within DST to fulfill pre-existing contracts with customers without becoming competitive with Heartland.[99]

The 2012 MOU memorialized the agreement between Heartland and inTEAM regarding the new program KidsChoose, but it did not alter the Co-Marketing Agreement.[100] Under the 2012 MOU, inTEAM would develop KidsChoose to allow parents to set up spending accounts for students to buy third-party products, and inTEAM would have exclusive marketing rights.[101] Heartland would share student payment information, allow promotion by a "banner ad" in Heartland's existing MLM program, provide the payment processing functionality

---

[98]     JX 29; JX 44.

[99]     JX 29, at 1; JX 34, at 1.

[100]    JX 44, at 1.

[101]    JX 42; JX 44, at 2-3.

for the KidsChoose website, and, in return, retain a portion of the revenue.[102] Over the course of the next year, Roberts and Goodman had multiple discussions regarding the pilot launch of KidsChoose.[103] Heartland selected the KidsChoose pilot schools in January 2014 and sent out the initial marketing e-mail campaign in March 2014.[104]

The KidsChoose launch failed to meet expectations.[105] Thereafter, Heartland decided not to devote additional resources to KidsChoose.[106] In August 2014, Heartland and inTEAM agreed that inTEAM would develop a version of KidsChoose that was independent of any Heartland product.[107] Heartland agreed to promote KidsChoose every six months through e-mails to parents in twenty MLM districts and to provide meal history for students who used KidsChoose.[108]

---

[102]  JX 44, at 2-3.

[103]  JX 105; JX 112; JX 131; JX 142; JX 143.

[104]  Tr. 1117-18 (Roberts).

[105]  JX 212 (stating that the first marketing campaign did not yield a single sign up for KidsChoose).

[106]  Tr. 1129-30 (Roberts).

[107]  JX 240.

[108]  *Id.*

As compensation, Heartland would receive two percent of revenue from KidsChoose transactions.[109]

### b. The USDA approves DST as a Menu Planning Tool

After the HHFKA's new regulations were finalized in 2012,[110] inTEAM incorporated the Simplified Nutrient Assessment components into the existing DST functions and created the "Menu Compliance Tool+" module, which became the first USDA-approved Menu Planning Tool for six cent certification.[111] inTEAM also added administrative review software to its arsenal in 2014.[112] inTEAM's Menu Compliance Tool+ currently is not approved as Nutrient Analysis Software.[113]

### c. Heartland partially terminates the Co-Marketing Agreement

In November of 2013, Heartland notified inTEAM that it was terminating the Co-Marketing Agreement as to WebSMARTT, State Compliance Software, MLM, Student Rewards, and Off-Campus Merchants because inTEAM had not

---

[109]   *Id.*

[110]   *See supra* Section II.B.

[111]   Tr. 387 (Griffin); Tr. 542 (Ditch).

[112]   Tr. 142 (Goodman).

[113]   JX 359; JX 360.

met sales targets for those products.[114]  Michael Lawler sent an e-mail to Chip

Goodman stating as follows:

> The purpose of this letter is to inform that you [sic] pursuant to the inTEAM/Heartland Co-Marketing Agreement, we would like to terminate to [sic] the CMA in relation to the following products and services identified in Exhibit B:

> - WebSMARTT

> - State Compliance Software

> - MLM

> - Student Rewards

> - Off Campus Merchants

> Pursuant to section 4.2.2 of the CMA, the sales thresholds for these products were not met as of the 2-year anniversary of the CMA's effective date.[115]

Goodman accepted this termination, but clarified that the MOU was still in

place regarding KidsChoose and DST by stating as follows:

> [W]e accept [Heartland]'s notice to terminate Exhibit B of the CMA.  That said, let's clarify a couple of points in areas where we have made very substantial investments: As you and I discussed at our meeting last week, the February 10, 2012 MOU (including the exclusivity rights described in the MOU) continues to govern our relationship with respect to Off-Campus Merchants/KidsChoose, and DST Phase II

---

[114]    JX 184; Co-Marketing Agreement § 4.2.2.

[115]    JX 184.

notwithstanding the termination of Exhibit B of the CMA.[116]

### d.   inTEAM employees e-mail potential customers

On July 24, 2014, Goodman sent an e-mail to Geri Hughes, an employee of inTEAM, with the subject line, "St Paul Window of Opportunity."[117]   Goodman writes in the e-mail "Did Mary Jo recap the opportunity to you?" to which Hughes replies, "Yes.  I will discuss with you when we meet this afternoon.  As you know, Jean's replacement (Jim) as [sic] not been as interested in help and this is her new approach."[118]  Below Hughes' reply is the tagline: "Note to Jim Hemmen regarding our menu planning tool/production record alternative to WebSMARTT."[119]

On December 15, 2014, Tuckwell e-mailed Jean Ronnei, the COO for St. Paul Public Schools, stating:

> Based on interactions I had with Jim at ANC in July I believe the department was still struggling with automating production records.  In August there was discussion of me providing a demo to key central office staff of the inTEAM menu planning and production record modules as an alternative to the WebSMARTT system.   That offer remains open if your team is interested . . . whether you stay with WebSMARTT or

---

[116]   JX 187.

[117]   JX 234.

[118]   *Id.*

[119]   *Id.*

are interested in an alternative, I would urge the team to prioritize this activity to achieve financial success.[120]

Tuckwell then forwarded this e-mail to Hughes, who sent it to Goodman and Michael Sawicky, a senior software engineer at inTEAM, saying that the inTEAM employees had "confirmed that Jim is leaving St Paul and he has been stopping our efforts so that is good. . . . I give MJ full credit for continuing to nurture this key relationship with Jean and for continuing to push for them to use our tools."[121]

### e. Heartland collaborates with Colyar on a joint proposal and inTEAM submits a competing proposal

On May 12, 2015, the Texas Department of Agriculture issued a "REQUEST FOR OFFERS TO PROVIDE Menu Analysis & Planning System (MAPS) Software Solutions" (the "Texas Request").[122] On May 27, 2015, inTEAM contacted Heartland regarding a potential joint proposal to the Texas Request.[123] Heartland declined.[124]

On June 19, 2015, Heartland, teamed with Colyar Technology Solutions, Inc. ("Colyar"), an inTEAM competitor since 2014, and submitted a bid to provide

---

[120]    JX 248.

[121]    *Id.*

[122]    PTO ¶ III.F.31.

[123]    JX 261, at 2.

[124]    *Id.* at 1.

a MAPS solution.[125]  Colyar's software assists state agencies in performing audits and administrative reviews for USDA compliance.[126]  Texas did not select the Heartland/Colyar joint proposal.[127]  After losing the bid, Heartland promised to "ramp up efforts with Colyar[]" to bid in other states.[128]

After the Heartland rejection, inTEAM submitted its competing bid to the Texas Request.[129]  In its proposal, inTEAM represents that its new software, will have the capability to meet all of the requirements of the Texas Request, including point-of-sale, nutrient analysis, and menu planning.[130]  inTEAM's proposal also was not selected by Texas.[131]  On July 20, 2015, inTEAM notified Heartland of its wrongful competition and breach of the Co-Marketing Agreement.[132]

---

[125]    PTO ¶ III.F.32-34; Tr. 142 (Goodman).

[126]    Tr. 141-42 (Goodman); Tr. 1161, 1165 (Roberts).

[127]    PTO ¶ III.F.32-34; Tr. 1166 (Roberts).

[128]    JX 295.

[129]    PTO ¶ III.F.32.

[130]    JX 275; Tr. 472-79 (Griffin).

[131]    PTO ¶ III.F.32-34.

[132]    JX 433.

### f. inTEAM launches CN Central

In July 2015, inTEAM presented its "Big Reveal" of the new, rebranded successor to DST, CN Central, to the public.[133] CN Central combined all of inTEAM's modules, including the Menu Compliance Tool+, under one system.[134] This brought together the ability to analyze certain nutrients, menu plan, menu search, menu share, generate production records, and assist administrative reviews.[135]

### g. An inTEAM employee gathers information regarding point of sale software

On March 22, 2016, inTEAM Senior Consultant Kim Coleman e-mailed Lisa Sims at the Kentucky School District stating:

> We are looking at adding a POS feature to our inTEAM software package to go with the Menu Planning, Production Records, Pre-cost, etc. My boss has asked me to reach out to several KY schools and see if I could get a copy of your current POS maintenance invoice for competitive research purposes. I was told that this should be public record and could help us offer the best deal possible in moving forward with this decision.[136]

---

[133] JX 265; Tr. 29 (Goodman).

[134] Tr. 283-84 (Goodman); Tr. 445, 448-51 (Griffin).

[135] *Id.*

[136] JX 418, at 2.

## C.    Parties' Contentions

inTEAM alleges that Heartland has materially breached the non-competition, exclusivity rights, and cross marketing and support provisions of the Co-Marketing Agreement.    Specifically, inTEAM avers that Heartland's partnership with Colyar breached the first two provisions, and its repeated failure to support inTEAM in various capacities or to display inTEAM's content breached the final provision.  inTEAM seeks damages, costs and attorney's fees, specific performance requiring Heartland to provide certain customer and reseller lists, and injunctive relief preventing Heartland from continuing to compete with inTEAM.

Heartland denies any breach and argues that the inTEAM Business as defined at the execution of the Co-Marketing Agreement controls, which at that time did not contain anything competitive with Colyar.  Furthermore, Heartland contends that it did not actually provide any service to Colyar, and inTEAM provided no evidence of Heartland's breach of cross-marketing or support obligations.  Heartland also asserts the defenses of laches, prior material breach, unclean hands, and prior termination.

Against  inTEAM,  Heartland  alleges  breach  of  the  Co-Marketing Agreement's non-competition provision because inTEAM developed a product, CN Central, which is competitive with WebSMARTT.    Heartland requests

injunctive relief enforcing the Co-Marketing Agreement, as well as costs and attorney's fees.

Against Goodman, Heartland asserts breach of both the non-competition and non-solicitation provisions under both the Asset Purchase Agreement and the Consulting Agreement. Heartland alleges Goodman violated his non-solicitation obligations by serving as majority owner and CEO of a company that has developed a product that competes with WebSMARTT. Heartland further claims that Goodman breached his non-solicitation obligations through his involvement with inTEAM employees' efforts to solicit business from St. Paul Public Schools. Heartland seeks injunctive relief preventing Goodman from engaging in any further competitive activities or further participation at inTEAM, and preventing inTEAM from using any of the knowledge or services provided by Goodman. Heartland also seeks disgorgement by Goodman of any profits realized from his competitive activities.

inTEAM and Goodman contend that they are not in breach of the non-competition provisions because the three agreements create the inTEAM Carve-Out, which includes the business currently run by inTEAM. Goodman argues he is not in breach of his non-solicitation obligations under the Asset Purchase Agreement or the Consulting Agreement because there is no evidence that he made any type of contact in violation of either agreement. Goodman contends he also is

not in breach of the non-solicitation provision under the Asset Purchase Agreement because he is not a Seller Shareholder as defined under that agreement. inTEAM and Goodman also assert the defenses of laches, acquiescence, waiver/estoppel, unclean hands, prior material breach, failure to mitigate damages, and ask for reduction/set off of damages against inTEAM's own damages.

## II. ANALYSIS

"Plaintiffs, as well as Counterclaim-Plaintiffs, have the burden of proving each element, including damages, of each of their causes of action against each Defendant or Counterclaim-Defendant, as the case may be, by a preponderance of the evidence."[137] Proof by a preponderance of the evidence means proof that something is more likely than not.[138] "By implication, the preponderance of the evidence standard also means that if the evidence is in equipoise, Plaintiffs lose."[139] Thus, to prevail on their respective breach of contract claims, both inTEAM as plaintiff and Heartland as counterclaim plaintiff must prove by a preponderance of the evidence (1) the existence of a contract, (2) the breach of an

---

[137] *Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*, 2015 WL 6611601, at *9 (Del. Ch. Oct. 30, 2015).

[138] *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010).

[139] *Revolution Retail*, 2015 WL 6611601, at *9; *2009 Caiola Family Tr. v. PWA, LLC*, 2015 WL 6007596, at *12 (Del. Ch. Oct. 14, 2015).

obligation imposed by that contract, and (3) damages suffered as a result of that breach.[140]

"A contract's express terms provide the starting point in approaching a contract dispute."[141] Delaware follows an objective theory of contracts, "which requires a court to interpret a particular contractual term to mean 'what a reasonable person in the position of the parties would have thought it meant.'"[142] When a contract is clear and unambiguous, "the court's role is to effectuate the parties' intent based on the parties' words and the plain meaning of those words."[143] "'In upholding the intention of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein.' The meaning inferred from a particular provision cannot control the meaning of the entire

---

[140] *Revolution Retail*, 2015 WL 6611601, at *9.

[141] *Ostroff v. Quality Servs. Labs., Inc.*, 2007 WL 121404, at *11 (Del. Ch. Jan. 5, 2007).

[142] *Charney v. Am. Apparel, Inc.*, 2015 WL 5313769, at *10 (Del. Ch. Sept. 11, 2015) (citing *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992)).

[143] *Zimmerman v. Crothall*, 62 A.3d 676, 690 (Del. Ch. 2013) (citing *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006)).

agreement if such an inference conflicts with the agreement's overall scheme or plan."[144]

"The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous."[145] Neither will "extrinsic, parol evidence . . . be used to manufacture an ambiguity in a contract that facially has only one reasonable meaning."[146] A term in a contract is ambiguous when it is "reasonably or fairly susceptible to different interpretations or may have two or more different meanings."[147] If a contract is ambiguous, a court may consider extrinsic evidence to interpret the intent of the parties.[148]

---

[144] *GMG Capital Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012) (quoting *E.I. du Pont de Nemours and Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985)).

[145] *Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010) (citing *Twin City Fire Ins. Co. v. Del. Racing Ass'n*, 840 A.2d 624, 628 (Del. 2003); *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)).

[146] *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007) (citing *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity.")).

[147] *Id.* (citing *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992)).

[148] *iBio, Inc. v. Fraunhofer USA, Inc.*, 2016 WL 4059257, at *5 (Del. Ch. July 29, 2016) (citing *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)).

None of the parties challenges the validity or enforceability of any of the provisions; as such, I do not analyze those issues. The claims, instead, hinge on this Court's interpretation of inTEAM Business as defined in the relevant agreements. Thus, I begin by analyzing the definition of inTEAM Business and determining whether the inTEAM business as currently conducted violates any of the non-competition provisions. Then, I analyze whether Heartland or Goodman breached any contractual obligations. Finally, I determine the appropriate remedy for any breaches.

## A. inTEAM's Business as Currently Conducted Does Not Breach its Non-Competition Obligations Under the Asset Purchase Agreement or the Co-Marketing Agreement

Heartland contends that inTEAM breached its non-competition obligations under the Co-Marketing Agreement because the inTEAM Carve-Out only extended to functionality that existed as of the closing date.[149] Heartland argues that, because inTEAM's CN Central product now can plan menus,[150] generate production records,[151] facilitate USDA compliance,[152] and analyze nutrients,[153]

---

[149]    Def.'s Opening Br. 37-38.

[150]    Tr. 344 (Griffin).

[151]    *Id.*

[152]    *Id.*

[153]    *Id.* at 445.

which are capabilities developed after closing, inTEAM is in breach of the non-competition provision.[154] For all the reasons stated below, inTEAM did not breach its non-competition obligations.

The Asset Purchase Agreement and the Co-Marketing Agreement contain materially similar non-competition obligations.[155] The Asset Purchase Agreement's non-competition provision states that SL-Tech and Goodman will not provide Competitive Services or Products (or any business that SL-Tech conducts) in the United States for five years.[156] The definition of SL-Tech and the definition of Competitive Services and Products exclude the inTEAM Business.[157] Similarly, the Co-Marketing Agreement prohibits inTEAM from directly or indirectly "providing any services or products competitive with [Heartland]."[158] Both the Asset Purchase Agreement and the Co-Marketing Agreement define the inTEAM Business as the consulting, eLearning, and DST portions of the business.[159] And,

---

[154]    Def.'s Opening Br. 43.

[155]    Although Heartland only asserts claims under the Co-Marketing Agreement against inTEAM, I also discuss the Asset Purchase Agreement for the sake of completeness.

[156]    Asset Purchase Agreement § 5(n), Ex. A-8 (definition of Restricted Territory).

[157]    *Id.* Exs. A-1, A-8.

[158]    Co-Marketing Agreement § 9.1.1.

[159]    Asset Purchase Agreement Ex. A-4; Co-Marketing Agreement § 1.1.2.

both definitions of the inTEAM Business reference those products and services described in Exhibit C to the Co-Marketing Agreement.[160] Exhibit C incorporates by reference the Functional Design Documents for "**DST Phase 2 (future release)**" (emphasis added).[161] Thus, the inTEAM Business as defined in the Asset Purchase Agreement, Co-Marketing Agreement, Exhibit C, and the Functional Design Documents, does not breach the non-competition provisions.

### 1. The inTEAM Business definition expressly includes the ability to plan menus, generate production records, and assist administrative reviews

Throughout 2010, SL-Tech closely followed the developments of the Committee on Nutritional Standards for National School Lunch and Breakfast Programs.[162] When the committee published the IOM Report in 2010, SL-Tech foresaw the sea change the new recommendations would bring under the HHFKA.[163] Thus, SL-Tech incorporated the IOM Report's proposed changes to de-emphasize nutrient analysis and emphasize food-based menu planning into their "2011 Business Plan," which was published at the end of 2010.[164] This plan

---

[160] *Id.*

[161] Co-Marketing Agreement Ex. C.

[162] JX 58, at 4-5.

[163] Tr. 54-55 (Goodman).

[164] JX 58, at 4-5.

42

discusses a product that will "focus on new menu planning requirements" and "may only be feasible in large districts or when offered by the state agencies."[165] SL-Tech also began to overhaul DST Phase 2 in 2010 in response to the IOM Report by incorporating the recommendations into the Functional Design Documents for DST Phase 2, which were finalized in early January 2011.[166]

The Functional Design Documents, including those titled "Milestone A — Menu Item" and "Milestone B — Menu Planning," envisioned a product that would have the new, post-HHFKA menu planning as its core concept. The menu planning functionality would allow the user to create, edit, copy, and save menu items, menu categories, and menus to be placed in menu cycles.[167] The user could manage the entire menu planning process from inputting a single serving of a specific food, to assigning it to a larger category, to arranging a collection of foods into a meal, to finally, creating a cycle of meals to rotate over weeks or months.[168] The Functional Design Documents also described a product that would allow schools or districts to project the menus' impact on other areas of food programs,

---

[165] *Id.* at 8.

[166] JX 3; JX 4.

[167] *See* JX 3, at 8-12; JX 4, at 19-22; Tr. 509-36 (Ditch).

[168] Tr. 501-503 (Ditch).

such as staffing, equipment, and food/labor costs.[169]  Both Heartland and inTEAM point to extrinsic evidence to support their competing interpretations of the inTEAM Business and whether menu planning is included.  I need not consider any extrinsic evidence because I find that the contract unambiguously includes menu planning in the inTEAM Carve-Out.

The Functional Design Documents also envisioned that DST Phase 2 would generate production records.[170]  The Functional Design Documents do not explicitly reference "production records" in the same way they mention menu planning.  Both parties, however, agree on the definition of a production record.[171]  Notably, Heartland's own witness, Prescott, testified that a production record is a comparison of what the school planned to serve, what the school actually prepared, and what the school actually sold.[172]  He stated these components include: the menu plan to which the school is referring, the menu cycle's week, how many of each item the school planned to serve, how many the school actually produced, and how many items they actually served.[173]  The DST Phase 2 Functional Design

---

[169]  JX 3; JX 4; JX 326; Tr. 33, 54-57 (Goodman).

[170]  JX 4.

[171]  *See* Tr. 794 (Prescott); Tr. 451-52 (Griffin).

[172]  Tr. 794.

[173]  *Id.* at 810.

44

Documents have inputs for all of these components.[174] Although Heartland points to extrinsic evidence to argue the agreement unambiguously supports its contention that production records are not included in the definition of inTEAM Business, I need not consider this evidence because the functionality is included, unambiguously, in the Functional Design Documents.[175]

To prove that the inTEAM Carve-Out includes administrative review software, inTEAM relies on Exhibit C, which states that DST Phase 2 will include "unique state value added functionality."[176] Goodman testified that he understood the phrase in Exhibit C to mean the ability to "allow[] [state reviewers or auditors] immediate access to records that they needed to review electronically that were created and generated generally at the school district level,"[177] causing "a breakthrough in the way audits were conducted and the value that was added for state agencies."[178] Additionally, Ditch testified that the cloud-based integration

---

[174]   *See* JX 4, at 31 (showing an input for Name, Served as Meal %, A La Carte %, and a Week and Day label); JX 326, at 259 (showing editable columns for Served as Meal %, A La Carte %).

[175]   *See* Def.'s Opening Br. 37, 43 (citing Sawicky Dep. Tr. 78, 79, 87); JX 104; Sawicky Dep. Tr. 14.

[176]   Pl.'s Opening Br. 52.

[177]   Tr. 91.

[178]   *Id.*

would allow both state agencies and school districts to use common functions and access records in real time."[179]

Goodman also testified that the phrase meant "during an administrative review related to menu plans, in particular, the ability to have school districts within that state either to utilize the third-party systems that they already had, or allow them to utilize our menu compliance tool directly so that the data feed was always available at the state level."[180] Griffin then testified that the "additional state value" of inTEAM's Menu Compliance Tool+ was that the state agencies are able to access the districts' menu information directly and, as a result, are able to modify the menus within the system to assure the district is in compliance before the agency comes on-site to do a review.[181]

Heartland does not rebut this testimony and instead argues that because this functionality did not exist until 2014, three years after the parties signed the Co-Marketing Agreement, it could not be part of the "state value added functionality" described in the agreement.[182] This argument fails because the definition of inTEAM Business, which references Exhibit C and discusses a "future release" of

[179]    Tr. 500-01 (Ditch); JX 23, at 33.

[180]    Tr. 153-54.

[181]    Tr. 414-15.

[182]    Def.'s Answering Br. 26-27.

46

DST Phase 2 as defined in the Functional Design Documents, anticipated the development of a product with functionality that did not exist at closing.

Heartland also argues "no inTEAM witness made any effort to show that the functionality of inTEAM's administrative review software module was identified in the functional design documents."[183] This argument ignores the first part of Goodman's testimony, which specifically discusses Exhibit C (and, by reference, the Functional Design Documents).[184] This argument also fails to address the language of the Functional Design Documents, which state "District Administrators [] will configure their districts within DST . . . State Agency Administrators (SAs) will . . . be able to access the new district and building setup screens."[185] Heartland offers no testimony or evidence to rebut these descriptions of the "unique state value added functionality" of the inTEAM Carve-Out, and inTEAM meets its burden to show it bargained for this functionality at the time of the transaction.

By January 2011, inTEAM was contemplating a future release of DST Phase 2 that would have greater functionalities than existed at the time of the agreement. Exhibit C and the Functional Design Documents expressly reference those

---

[183]     *Id.* at 27.

[184]     Tr. 91 (Goodman).

[185]     JX 3-4, at 5.

functionalities, which included the ability to plan menus, generate production records, and assist administrative reviews.  Heartland agreed to incorporate Exhibit C and the Functional Design Documents into the inTEAM Business definition described in the Asset Purchase Agreement and the Co-Marketing Agreement, and it cannot now simply ignore what those documents state.

### 2. The ability to analyze certain nutrients does not violate the non-competition obligations

Heartland also points to the Menu Compliance Tool+'s ability to analyze limited nutrients to show that inTEAM attempted to "engage in providing"[186] products and services competitive with WebSMARTT.[187]  The parties seem to agree that Heartland had the exclusive ability to conduct "nutrient analysis" as the USDA regulations define that term.[188]  The parties, however, dispute whether the ability to analyze a more limited subset of nutrients would violate the non-competition clause.[189]  Neither the Asset Purchase Agreement nor the Co-Marketing Agreement addresses this issue or expressly defines "nutrient analysis."  Therefore, I look to the USDA regulations, because the very purpose of this

---

[186]    Co-Marketing Agreement § 9.1.1.

[187]    Def.'s Opening Br. 31.

[188]    *See* Tr. 21-22, 122, 154-56 (Goodman); Def.'s Opening Br. 33.

[189]    Pl.'s Answering Br. 18; Def.'s Opening Br. 33 n.10.

48

software is to aid districts in reporting for USDA compliance.  Even if Heartland can point to some overlap in the functionalities of WebSMARTT and inTEAM's Menu Compliance Tool+ in terms of analyzing nutrients, Heartland fails to prove that inTEAM's product improperly competes with WebSMARTT.

Nutrient Analysis Software and Menu Planning Tools perform different functions under the HHFKA.[190]  Nutrient Analysis Software, such as WebSMARTT, can run a full nutrient analysis, while Menu Planning Tools, such as inTEAM's Menu Compliance Tool+, can run a Simplified Nutrient Assessment of calories, saturated fat, and sodium.[191]  Heartland's own expert witness admitted that this is only a subset of the nutrients WebSMARTT can analyze, and inTEAM's Menu Compliance Tool+ cannot analyze the full range of components necessary for a full nutrient analysis.[192]

Heartland tries to argue that the classification of the products is not the issue, but rather the overlapping functionality.[193]  The USDA, however, classifies these various software programs according to their functionality in carrying out the

---

[190]    *See supra* Section I.B.

[191]    *See id.*

[192]    Tr. 921-22 (Fox).

[193]    Def.'s Opening Br. 35, n.10.

purpose of the regulations.[194] The USDA approves certain programs as one and not the other, and some as both.[195] Heartland should be familiar with this concept, as WebSMARTT unsuccessfully attempted to obtain USDA approval as a Menu Planning Tool,[196] and another Heartland program, Mosaic Menu Planning, is an approved Menu Planning Tool and Nutrient Analysis Software.[197] Thus, Heartland has not met its burden to prove that inTEAM's Menu Compliance Tool+'s ability to analyze limited nutrients violates the Co-Marketing Agreement's non-competition provision.

## B. Heartland Breached its Non-Competition and Exclusivity Obligations Under the Co-Marketing Agreement

inTEAM argues that Heartland breached its obligation not to compete with inTEAM (directly or indirectly) when Heartland collaborated with Colyar, a direct competitor of inTEAM, to create an interface between Heartland's Mosaic Menu Planning product and Colyar's administrative review software for the express

---

[194]    JX 400 (stating that Menu Planning Tools provide an assessment of meal pattern contributions and a Simplified Nutrient Assessment that does not require data entry, while Nutrient Analysis tools provide nutrient analysis from a data source and weighted nutrient analysis).

[195]    *See* JX 359; JX 360 (listing different programs on each list, with only some programs on both lists); JX 400 (stating that if certain software programs consist of both assessment of meal pattern contributions and nutrient analysis functions, they need both approvals).

[196]    Tr. 875 (Prescott).

[197]    *See* JX 359; JX 360 (Mosaic appears on both lists).

purposes of "provid[ing] state auditors a consistent view of school district menu data so that they can perform audits in a more efficient manner" and offering "access to school district menu data as needed in performing an audit and providing recommendations."[198] inTEAM alleges that by enhancing the "state value added functionality" of Colyar's products through a data exchange between Mosaic Menu Planning and Colyar's administrative review software, Heartland improperly assisted a direct competitor.[199] inTEAM concedes that Heartland lost the bid and had no opportunity to provide the services, but inTEAM argues that Heartland's failure to secure the Texas bid does not excuse Heartland's "indirect[]" competition with inTEAM.[200]

Under the Co-Marketing Agreement, Heartland cannot "engage, directly or indirectly . . . in providing services or products competitive with the inTEAM Business."[201] This non-competition obligation excludes products and services defined as "[Heartland] Business." Thus, I must determine whether the products

---

[198] JX 227, at 3-4; JX 255, at 5 (Heartland will "[p]rovide Mosaic menu planning in a hosted environment for access by Colyar's Customers (i.e., States) and Users (i.e., School Districts).").

[199] Pl.'s Opening Br. 55.

[200] Pl.'s Opening Br. 55; *see Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at *21 n.242 (Del. Ch. July 22, 2015) ("Directly engaging in the proscribed Business would entail the actual provision of mobile diagnostic services to nursing facilities by [defendant] himself.").

[201] Co-Marketing Agreement § 9.1.1.

and services at issue are reserved for inTEAM, Heartland, or both. Under the Co-Marketing Agreement, both Heartland and inTEAM can build and maintain products with menu planning functions.[202] Additionally, Heartland may own products that conduct a full nutrient analysis, as understood under the relevant regulations at the time of the transaction.[203] inTEAM's Business includes the ability to build products that assist state agencies in conducting their administrative review process as part of "unique state value added functionality."[204]

Heartland does not rebut inTEAM's purported definition of "unique state value added functionality" under the Asset Purchase Agreement and Co-Marketing Agreement.[205] Heartland also does not argue that its own business as defined in the relevant agreements contains a similar "state value added functionality" or administrative review software of any kind. Thus, the non-competition provisions allow inTEAM, but not Heartland, to provide administrative review software. Heartland cannot now obtain through this Court what it did not reserve for itself in contract negotiations.

---

[202]    *See supra* Section II.A.1.

[203]    *See id.*

[204]    *See id.*

[205]    Def.'s Answering Br. 25-27.

Heartland teamed with Colyar to provide the same functionality that the Asset Purchase Agreement and the Co-Marketing Agreement reserve for inTEAM. Although offering Heartland's Mosaic Menu Planning product on its own would not have been a breach,[206] Heartland assisting a direct competitor of inTEAM's administrative review software, Colyar, indirectly breached the non-competition obligations under the Co-Marketing Agreement.[207] Based on the same facts, Heartland also breached its exclusivity obligations under the same provision.[208]

### C. Heartland Did Not Breach its Cross-Marketing and Support Obligations Under the Co-Marketing Agreement

inTEAM argues that Heartland breached its cross-marketing and support obligations under various provisions of Section 2 of the Co-Marketing Agreement. Specifically, inTEAM asserts that Heartland breached its obligations with respect to its lack of support for KidsChoose and its refusal to integrate DST and

---

[206] Both Heartland and inTEAM have the ability to own and develop products with menu planning functionality.

[207] *See, e.g.*, *Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at \*21 n.242 (Del. Ch. July 22, 2015) (holding former CEO's involvement in assisting a direct competitor's "efforts to replace [plaintiff] as the service provider" was a breach.); Pl's Opening Br. 55.

[208] *Cf.* Def.'s Answering Br. 27 (arguing "any exclusivity requirement found in Section 9.1 of the CMA does not apply because inTEAM was not 'conducting the inTEAM Business' by marketing menu planning and administrative review software to Texas.").

Nutrikids/WebSMARTT.[209]  inTEAM's conclusory allegations of breaches of Section 2 of the Co-Marketing Agreement fail.

Under Section 2 of the Co-Marketing Agreement, Heartland is obligated to (1) "prominently display Licensed Content provided by inTEAM on the MLM website;"[210] (2) "work in good faith with inTEAM" to consider incorporating the Licensed Content "into other [Heartland] K-12 payment center websites;"[211] (3) provide inTEAM with customer and reseller lists of MLM and Developed Websites of Heartland in order to market and sell Student Rewards and Off-Campus Merchants;[212] (4) provide limited access (as necessary to perform obligations under the Co-Marketing Agreement) to intranet, software, networks, hardware, technology, or computer-based resources;[213] and (5) use "commercially reasonable best efforts to develop and maintain all" related described products, websites, and technology assets to ensure the integration and cross-promotion of the products.[214]

---

[209]  Pl.'s Opening Br. 56-57.

[210]  Co-Marketing Agreement § 9.1.1.

[211]  *Id.*

[212]  *Id.* § 2.5.2.

[213]  *Id.* § 2.6.

[214]  *Id.* § 2.8.

54

### 1. Heartland did not breach its obligations with respect to KidsChoose under Section 2 of the Co-Marketing Agreement

In order to decide whether Heartland breached its obligations, I must first determine the true ownership of KidsChoose. The Co-Marketing Agreement designates Off-Campus Merchants and Student Rewards as Heartland products.[215] Goodman testified that KidsChoose was the "embodiment of Off-Campus Merchants and rewards program that was described in the [Co-Marketing Agreement]," which Goodman admitted were Heartland products at the time of the execution of the Co-Marketing Agreement.[216] In his deposition, Roberts testified that Off-Campus Merchants and Student Rewards were "inTEAM products."[217] At trial, Roberts clarified that each side was to focus on developing the capabilities it knew best—Heartland on MLM and inTEAM on KidsChoose—but that Heartland did not transfer ownership of Student Rewards or Off-Campus Merchants.[218] Further, the 2012 MOU explicitly states that it does not modify the Co-Marketing Agreement.[219] Thus, the Co-Marketing Agreement's language remains in full

---

[215]    Co-Marketing Agreement Ex. B.

[216]    Tr. 103, 284-85 (Goodman).

[217]    Roberts. Dep. 39-40.

[218]    Tr. 1048-53.

[219]    JX 44, at 1.

effect, and Heartland continues to own Off-Campus Merchants and Student Rewards, which KidsChoose embodies.

### a. Heartland validly terminated the Co-Marketing Agreement as to Off-Campus Merchants and Student Rewards

Heartland partially terminated the Co-Marketing Agreement in a November 26, 2013 e-mail from Lawler to Goodman.[220] Under Section 4.2.2 of the Co-Marketing Agreement, the "Recipient" (in this case, Heartland) of the cross-marketing services has the ability to terminate with respect to a specific product if the "Provider" (in this case, inTEAM) does not meet its particular goals related to that product.[221] Heartland specifically terminated the agreement as to WebSMARTT, State Compliance Software, MLM, Student Rewards, and Off-Campus Merchants.[222] inTEAM does not challenge Heartland's ability to terminate or the enforceability of the termination as to Heartland's products.[223] Instead, inTEAM argues that the 2012 MOU "continued to govern the relationship with respect to Off-Campus Merchants/KidsChoose, and DST Phase II."[224]

---

[220]    JX 184.

[221]    Co-Marketing Agreement § 4.2.2.

[222]    JX 184.

[223]    Pl.'s Opening Br. 57-58.

[224]    JX 187.

As discussed more thoroughly above, Goodman testified that KidsChoose was a "brand of" Off-Campus Merchants and Student Rewards, which were Heartland products at the time of the execution of the Co-Marketing Agreement.[225] Thus, Heartland had the right to terminate its obligations as they related to KidsChoose. Section 4.2.2 provides that any termination of a product causes "the corresponding obligations set forth in Section 2" to cease to apply, as long as the Recipient gives the Provider "30 days' prior written notice" and the termination is within 60 days after the applicable anniversary of the Effective Date."[226] This means Heartland's obligations under the agreement ended as of December 26, 2013.[227]

### b. Heartland's conduct prior to the termination did not breach its obligations under Section 2 of the Co-Marketing Agreement

inTEAM argues that even if the agreement was terminated at the end of 2013, Heartland is still liable for any breach prior to the termination.[228] The 2012 MOU gave inTEAM the "exclusive right to market and sell products and services

---

[225] Tr. 103, 284-85 (Goodman); *see supra* Section 2.C.1.

[226] Co-Marketing Agreement § 4.2.2.

[227] Heartland was validly within sixty days of the execution of the agreement (before November 26, 2013) and the beginning of the term of the agreement (before December 1, 2013). inTEAM does not argue Heartland's termination was invalid on timeliness grounds.

[228] Pl.'s Opening Br. 57-58 n.24.

on the KidsChoose . . . website[]" and stated that inTEAM "shall develop the functionality described in the FDD relating to the . . . KidsChoose website[]."[229] Meanwhile, Heartland was to develop "the functionality contained within MLM and . . . web service functionality consistent with the FDD to exchange identified information with the inTEAM-developed websites."[230] inTEAM asserts that Heartland did not display any "Licensed Content" to promote KidsChoose and did not work "in good faith" with inTEAM to promote KidsChoose on its other "K-12 payment center websites" that replaced MLM in 2015.[231] inTEAM, however, does not point to any materials it "designate[d] in writing as 'Licensed Content'" under the Co-Marketing Agreement and provided to Heartland that Heartland then refused to display as required under Section 2.4.[232] Therefore, inTEAM has not met its burden to prove breach under this section of the Co-Marketing Agreement.

Similarly, with regard to Heartland's obligation to provide customer and reseller lists under Section 2.5.2 of the Co-Marketing Agreement, inTEAM asserts that Heartland never furnished the required lists of parents to inTEAM in support

---

[229]   JX 44, at 2.

[230]   *Id.*

[231]   Pl.'s Opening Br. 56.

[232]   Co-Marketing Agreement §§ 5.2.1, 2.4.

of KidsChoose before the termination.[233] Heartland offers evidence that it did produce these lists prior to November 2013 for the purposes of allowing inTEAM to conduct marketing under the Co-Marketing Agreement.[234] inTEAM does nothing to rebut either the list produced by Heartland or Roberts's testimony that the list was produced for marketing purposes. At the very least, inTEAM has not met its burden of proving that it is more likely than not that Heartland did not produce these lists.

inTEAM also argues that Heartland failed to timely respond to scheduling Steering Committee meetings, did not agree to a "reasonable timeline" for development, and never agreed to a final version of the functional design document for KidsChoose.[235] All of these claims refer to obligations under the 2012 MOU and under Section 12.2.3 of the Co-Marketing Agreement, neither of which

---

[233]    Pl.'s Opening Br. 57.

[234]    JX 97 (showing an e-mail from Erik Ramp, Vice President of Operations at inTEAM, dated Oct. 30, 2012, to Roberts at Heartland, with an attached document titled "HPS Customer List 2012"); Tr. 1080-81 (Roberts) (stating that this list was sent for the purposes of allowing inTEAM to do marketing under the Co-Marketing Agreement).

[235]    Pl.'s Opening Br. 37.

inTEAM argues that Heartland breached.[236] Therefore, I need not consider inTEAM's arguments as to these issues.

inTEAM generally argues that Heartland engaged in various delay tactics that caused KidsChoose to launch much later than expected. Specifically, inTEAM argues that in 2012, Heartland assured inTEAM it would be ready to meet its June 15 deadline, but in May, Heartland told inTEAM it was "stopping development."[237] Heartland offered no justification, provided no information about what Heartland had already developed, refused to establish a new timeline for the product, and ignored inTEAM's inquiries.[238] inTEAM also asserts that Heartland delayed in (1) selecting the pilot schools, which occurred in January 2014, and (2) sending e-mails to promote KidsChoose, which occurred in March 2014.[239]

---

[236] *See* JX 44, at 2 ("The Steering Committee will mutually agree on a functional design document ('FDD') to detail the functionality described in this MOU. Based on that FDD, the Steering Committee will agree to a timeline."); Co-Marketing Agreement § 12.2.3 ("The Steering Committee shall meet at such frequency as mutually agreed by the Parties, but in any event no less frequently than once per month. Steering Committee meetings shall be at a mutually acceptable location or telephonically.").

[237] Pl.'s Opening Br. 37; JX 380; JX 384; JX 385.

[238] *Id.*

[239] Pl.'s Opening Br. 38.

With respect to the June 2012 deadline, Heartland contends that it completed its development work,[240] but that inTEAM caused the delay of the pilot launch because of its own inability to secure regulatory approval until the end of January 2014.[241] Heartland also argues that the departure of Scott Fennel, an inTEAM employee responsible for securing deals for KidsChoose, caused severe internal disruption at inTEAM and further delays.[242] Moreover, Heartland alleges that as soon as inTEAM notified Heartland of the necessary approvals, Heartland immediately complied with its obligations to launch the pilot.[243] inTEAM concedes that the pilot schools were selected in January 2014, presumably the same time as inTEAM secured its regulatory approval.[244] Importantly, inTEAM

---

[240]    JX 388; *see also* JX 137, at 2; JX 142.

[241]    Def.'s Answering Br. 16; JX 193 (showing a Jan. 24, 2014 e-mail from Goodman stating "it has been a tedious, expensive, and time consuming task to craft a model for state bank regulators where rules differ. . . . We believe that we have finally resolved the custodial and other mulit[sic] state issues with the ability to write and manage differential agreements.").

[242]    Def.'s Answering Br. 13 (quoting JX 387, an e-mail from Ditch on Jan. 29, 2013) ("[D]ue to the issues we were having with Scott that it wouldn't be wise to hunt [Heartland] down for this because we wouldn't have any Deals to pilot with anyways, and it was better to restart the conversation when we have our act together."); *id.* at 15-16 (quoting JX 148, an e-mail from Sawicky on May 7, 2013) ("[T]he project is already three weeks behind with regard to staffing and provisioning" and "I'm trying to fudge an update to the Project Plan that we can share with [Heartland] and that doesn't air too much of our dirty laundry.").

[243]    Def.'s Answering Br. 16.

[244]    Pl.'s Opening Br. 38.

does not suggest that it received the regulatory approval before January 2014, or that Fennel's departure did not cause severe issues. Therefore, inTEAM has not proven that it is more likely than not any delay in the KidsChoose launch or the integration problems were due to Heartland's behavior.

With respect to Heartland's "obligation" to send e-mails promoting KidsChoose, inTEAM suggests that Heartland sent the emails in March 2014, two months after the launch, which was too late. But, inTEAM does not argue what specific provision of the Co-Marketing Agreement this action breaches, if any. inTEAM simply asserts the fact that this occurred, which is not enough to prove a breach by Heartland.

inTEAM also points to the "integration problems" between KidsChoose and MLM as causing a negative impact on the pilot launch.[245] inTEAM states that it repeatedly tried to engage Heartland to address the issues, but Heartland ignored these requests.[246] inTEAM's evidence of its attempts to engage Heartland are dated June 2014, months after the pilot launch failure and the termination of the Co-Marketing Agreement.[247] As Heartland did not have any continuing obligations under the Co-Marketing Agreement to support the prior version of

---

[245]   *Id.*

[246]   *Id.*

[247]   JX 225.

KidsChoose in 2014, inTEAM has not met its burden of proving Heartland breached its obligations.

After the failure of the KidsChoose launch, Heartland further agreed to allow inTEAM to develop a stand-alone version of KidsChoose, independent of any Heartland products, and to send promotional e-mails to MLM users every six months and provide user data to inTEAM.[248] Concerning the e-mail obligation, Heartland agreed to send "jointly designed emails" to parents in certain districts using their payment platforms promoting KidsChoose and to provide meal information for students who performed transactions using KidsChoose.[249] inTEAM alleges that Heartland failed to comply with its new obligations. But, inTEAM produces no evidence of any "jointly designed e-mails" or even inTEAM's drafts of such e-mails. Regarding the user data, Heartland produces evidence that it provided the required user data in December 2014, including an e-mail from Goodman to Roberts thanking him for the data.[250] Although inTEAM points to certain testimony that the information Heartland produced was not in a "final usable KidsChoose launchable form,"[251] it provides no explanation for why

---

[248]   Pl.'s Opening Br. 40; JX 240; JX 242.

[249]   JX 242.

[250]   JX 414; JX 415; JX 416.

[251]   Tr. 139 (Goodman).

the data was not usable or how being in a final, usable form was required per the parties' 2014 agreement.[252]  Hence, inTEAM has not met its burden of proving Heartland did not comply with its obligations.

## 2. Heartland did not breach its obligations with respect to DST

inTEAM argues that Heartland did not cooperate with inTEAM's attempts to create an interface between Heartland's Nutrikids and WebSMARTT and inTEAM's DST, which would have allowed DST to extract data from Nutrikids and WebSMARTT.[253]  inTEAM argues Heartland violated Section 2.8 of the Co-Marketing Agreement by not using "commercially reasonable best efforts" to maintain its products for the purpose of cross-promoting inTEAM's products, as well as Section 2.6 of the Co-Marketing Agreement, by not providing limited access to Heartland's technology for the purpose of allowing inTEAM to "market, advertise and promote sales and licenses" of Heartland.[254]

As an initial matter, Nutrikids is not subject to the Co-Marketing Agreement, and any claim regarding obligations towards that product fail.  The "HPS

---

[252]    Pl.'s Opening Br. 40; JX 242 ("[Heartland] will return the meal history for breakfast and lunch or "invalid ID" or "no meal history". [sic]  We will not need other information or addresses.  This query will include some students eligible for free meals and possibly on other [Heartland] platforms as well.").

[253]    Pl.'s Opening Br. 46.

[254]    *Id.* at 46, 57.

64

Products" that are subject to the Co-Marketing Agreement are WebSMARTT, MLM, Student Rewards, and Off-Campus Merchants.[255] There is no mention of Nutrikids, a product Heartland acquired well after the SL-Tech transaction, in the Co-Marketing Agreement.[256] Therefore, the Co-Marketing Agreement imposes no obligations as to this product.

With regard to WebSMARTT, inTEAM fails to demonstrate adequately the basis for this alleged breach. inTEAM's sole evidence of this breach is Goodman's testimony that inTEAM "looked forward to [Heartland's] continuing support connections to WebSMARTT for our Portland contract."[257] To the extent this claim relates to Section 2.8, inTEAM does not explain how Heartland failed to use "commercially reasonable best efforts" to "develop and maintain" WebSMARTT with the specifications under Section 2.8 for the purpose of cross-promotion.[258] inTEAM merely states that Heartland "failed to continue supporting an interface" that inTEAM relied on for an "existing contract."[259] As to Section 2.6, inTEAM does not allege attempts to cross-promote WebSMARTT or that

---

[255]    Co-Marketing Agreement at 1.

[256]    Pl.'s Opening Br. 41.

[257]    Tr. 89 (Goodman).

[258]    Co-Marketing Agreement § 2.8.

[259]    Pl.'s Opening Br. 46.

inTEAM was not able to access to Heartland's technology in order to do so. Thus, inTEAM fails to prove that Heartland breached Section 2 of the Co-Marketing Agreement.

### D. No Affirmative Defenses Bar inTEAM's Claims

Heartland asserts the following affirmative defenses as a bar to inTEAM's claims: (1) laches, (2) prior material breach, (3) unclean hands, and (4) failure to mitigate damages.

First, Heartland argues that the doctrine of laches bars inTEAM's claims. The standard for a traditional laches analysis requires a defendant to prove three elements: (1) the plaintiff had knowledge of the claim; (2) the plaintiff unreasonably delayed in bringing suit on that claim; and, (3) the delay resulted in injury or prejudice to the defendant.[260] Heartland asserts that inTEAM knew of the breach by December 6, 2014,[261] but inTEAM waited nine months to file this suit on September 21, 2015.[262] Heartland ignores inTEAM's July 20, 2015 letter to

---

[260] *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 210 (Del. 2005).

[261] JX 381 (containing an e-mail attachment to Goodman from Craig Cheslog, Principal Advisor to California State Superintendent of Public Instruction, which showed the California Department of Education was using Colyar's product for administrative review, and was working with Heartland to create a menu planning interface that could be used by state administrators in Colyar's system); Tr. 147-49 (Goodman).

[262] Def.'s Answering Br. 45-46.

Heartland notifying Heartland of its breach.[263]  Thus, the "delay" at issue here is seven months.  Heartland fails to convince me that this was an unreasonable delay under the facts and circumstances of this case.  Additionally, Heartland has not argued adequately that it suffered any injury from this seven-month delay.  If the alleged injury is Heartland's investment in the Colyar relationship, Heartland engaged in that behavior before inTEAM knew about the breach.  To the extent that Heartland has incurred some cost by investing further in its relationship with Colyar after finding out about inTEAM's objections, it did so at its own risk, as it was on notice of its possible violation.

Second, Heartland asserts that inTEAM's development of a product that improperly competes with WebSMARTT was a prior material breach by inTEAM that bars its recovery.  As discussed above, however, inTEAM is not in breach of its non-competition obligations, and this defense fails.[264]

Third, Heartland asserts the unclean hands defense.  Heartland argues that inTEAM "violated conscience or good faith or other equitable principles in [its] conduct"[265] by concealing its prohibited development of the Menu Compliance

---

[263]   JX 433.

[264]   *See infra* Section II.A.

[265]   *Sutter Opportunity Fund 2 LLC v. Cede & Co.*, 838 A.2d 1123, 1131 (Del. Ch. 2003).

Tool+, and as a result, "the doors of equity should shut against [inTEAM]."[266] The Co-Marketing Agreement, however, allowed inTEAM to develop its Menu Compliance Tool+. Further, the evidence on which Heartland relies actually undercuts Heartland's argument.[267] On June 8, 2012, the same year the Menu Compliance Tool+ was approved as a Menu Planning Tool, Erik Ramp, Vice President of Operations at inTEAM, e-mailed Roberts at Heartland to "make sure [he] was clear about what [inTEAM was] doing with menu compliance."[268] Ramp informed Roberts that inTEAM was "building a menu compliance tool for use under Option #2 to certify menus submitted under the new regulations,"[269] which expressly included menu planning and analysis of certain nutrients, namely calories, saturated fat, and sodium.[270] Ramp went on to assure Roberts that inTEAM was "not building full nutrient analysis software like what you have in the POS."[271] He added that the product may be sold to both states and districts.[272]

---

[266] *Id.*

[267] Tr. 1185-87 (Roberts).

[268] JX 425.

[269] *Id.*

[270] *See supra* Section I.B.

[271] JX 425.

[272] *Id.*

And he ended by stating that the new software is an add-on to DST.[273] This is exactly what inTEAM proceeded to do. Thus, Heartland fails to prove that inTEAM was not being transparent. Moreover, as explained below, Heartland has also not met its burden of proving that inTEAM is "surreptitiously developing" point of sale software.[274] Thus, the claim of unclean hands fails.[275]

Fourth, and finally, Heartland asserts the defense that inTEAM has made no effort to mitigate damages. Because I do not award damages for Heartland's breach of the Co-Marketing Agreement, I need not analyze this defense.

### E. Goodman Did Not Breach His Non-Competition Obligations Under the Asset Purchase Agreement or the Consulting Agreement

Heartland argues that Goodman's ownership of CN Central and his related work at inTEAM violates the non-competition provisions in both the Asset Purchase Agreement and the Consulting Agreement because CN Central can generate the same types of data that WebSMARTT could prior to closing, namely analyzing nutrients, planning menus, and generating production records, and

---

[273]    *Id.*

[274]    *See infra* Section II.E.2.

[275]    Def.'s Answering Br. 53.

because inTEAM is developing point of sale software.[276]  Heartland, however, fails to prove these allegations.

### 1.    Work at inTEAM

The Asset Purchase Agreement provides that Goodman improperly competes with Heartland if he engages, directly or indirectly, "in providing any Competitive Services or Products" or "any business that [SL-Tech] conducts as of the Closing Date" in the United States.[277]  Under the Consulting Agreement, Goodman may not  "directly or indirectly . . . become an owner of any outstanding capital stock, or a member or partner of any . . . entity that engages in Competitive Business within the Restricted Territory; or perform or provide any services . . . for any . . . entity that engages in Competitive Business within the Restricted Territory."[278]

The definitions of SL-Tech and Competitive Services or Products (in the Asset Purchase Agreement) and Competitive Business (in the Consulting Agreement) exclude the inTEAM Business.[279]  The inTEAM Business expressly

---

[276]    Def.'s Opening Br. 30, 33-34.

[277]    Asset Purchase Agreement § 5(n).

[278]    Consulting Agreement ¶ 11.a.

[279]    The Consulting Agreement directly states "Competitive Business shall not include the inTEAM Business (as defined in the Asset Purchase Agreement)."  Consulting Agreement § 11(a); *see also supra* Section I.B.2.a.i.

70

includes the ability to create menus and generate production records, and analyzing certain nutrients does not *per se* make a product competitive with WebSMARTT.[280] Therefore, Heartland has not proven Goodman violated his non-competition obligations by owning a competitive business under either the Asset Purchase Agreement or the Consulting Agreement.

### 2. Point-of-sale software

Heartland also fails to prove that inTEAM is surreptitiously developing point of sale ("POS") software and, as such, has failed to prove that Goodman breached certain non-competition obligations under the Asset Purchase Agreement or the Consulting Agreement.

Heartland cites to *Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*, as support for the proposition that "broad non-compete language regarding development"[281] would prevent an entity from beginning to develop, design, or market a competitive product, i.e. a "running start."[282] Even if the provisions in the Asset Purchase Agreement or the Consulting Agreement at issue here prohibit a "running start," Heartland fails to prove that inTEAM began such a process.

---

[280] *See supra* Section II.A.

[281] Def.'s Opening Br. 38.

[282] *Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*, 2015 WL 6611601, at \*11 (Del. Ch. Oct. 30, 2015).

71

Heartland relies on one e-mail to prove the "running start" allegations. That e-mail, sent by inTEAM employee Kim Coleman to the Kentucky School District, states that inTEAM is "looking at adding a POS feature" to the inTEAM software package and requests a copy of Kentucky's POS maintenance invoice for "competitive research purposes."[283] Griffin testified that inTEAM knew this type of software improperly would compete with Heartland until September 30, 2016; thus, inTEAM simply was "gathering information" and conducting research.[284]

Comparatively, in *Revolution Retail*, the defendant claimed that the non-competition provision at issue only prohibited an "actual sale" of a competitively priced product.[285] The defendant argued it was not in breach because it was conducting "market research," and it never formally agreed to sell a competitive product.[286] This Court held that the defendant was in fact engaging in actual negotiations intended to sell the competitive product, and the non-competition

---

[283]    JX 418, at 2.

[284]    Tr. 471-72 (Griffin).

[285]    *Revolution Retail*, 2015 WL 6611601, at *11-12.

[286]    *Id.*

agreement prohibited such behavior, as well as other behavior occurring much earlier than the point of sale.[287]

The plaintiff in that case proved the breach through an exchange of e-mails that showed multiple employees' "desire to move towards, or beyond, the [competitive] price line,"[288] as well as a document specifying the technical plans to develop the competitive product, and various sell-side documents prepared during the non-competition period that explicitly discussed the competitive product.[289] Here, one e-mail stating that inTEAM is "looking at adding a POS feature" hardly rises to the level of proving by a preponderance of evidence that inTEAM has begun development of POS software, or is otherwise actively engaging in selling POS software while claiming to gather information and conduct research.[290] As such, Heartland has failed to show a breach of Goodman's non-competition obligations.

---

[287]  *Id.* (stating defendant "undertook, directly and indirectly, to assist and advise others, and to both engage in, and propose to engage in, the development, marketing, and manufacturing of the . . . R50 at per unit selling prices above the Inflation Adjusted Price Line.  I find unpersuasive [defendant]'s argument that the R50 cannot be proven to 'have a selling price' above the price line because [defendant] never actually sold an R50 at any price during the Non-Competition Period.").

[288]  *Id.* at *12.

[289]  *Id.* at *12-13.

[290]  Def.'s Opening Br. 26.

### F. Goodman Did Not Breach His Non-Solicitation Obligations Under the Asset Purchase Agreement

Heartland argues that Goodman breached his non-solicitation obligations under the Asset Purchase Agreement by "working on behalf of inTEAM" to solicit business from an undisputed Protected Customer, St. Paul Public Schools.[291]

Section 5(o) of the Asset Purchase Agreement prohibits solicitations made "for the purpose of providing Competitive Services or Products."[292] The definition of "Competitive Services or Products" explicitly excludes the inTEAM Business. Therefore, any solicitation of a customer of Heartland simply for the purposes of providing the inTEAM products included in the inTEAM Carve-Out is not a violation of this provision. As such, Goodman is not in breach, and the Court need not address Goodman's argument that the Asset Purchase Agreement's non-solicitation provision does not bind him.

### G. Goodman Breached His Non-Solicitation Obligations Under the Consulting Agreement

Heartland also argues that Goodman breached his non-solicitation obligations in the Consulting Agreement by encouraging St. Paul Public Schools to

---

[291] *Id.* at 39-40; JX 25, at 291 (showing list of customers of inTEAM for twelve months ended on June 30, 2011); Tr. 242 (Goodman) (stating that St. Paul was a WebSMARTT customer prior to the transaction between SL-Tech and Heartland and was a customer of Heartland after the transaction).

[292] Asset Purchase Agreement § 5(o).

modify adversely its relationship with Heartland. Heartland points to two e-mail chains discussing St. Paul Public Schools as a possible opportunity for inTEAM as evidence that Goodman breached his non-solicitation obligations under the Consulting Agreement. In the first e-mail chain, dated July 24, 2014, Goodman emails Hughes about the "St. Paul Window of Opportunity" asking whether Tuckwell relayed the news to her about the opportunity.[293] Included in Hughes' reply is a note to Jim Hemmen, the point of contact at St. Paul, regarding inTEAM's "menu planning tool/production record alternative to WebSMARTT."[294] Hughes also plans to have a future conversation with Goodman about Tuckwell's "new approach" to get Hemmen interested in inTEAM.[295]

In the second e-mail chain, Tuckwell e-mails Ronnei, the COO at St. Paul, on December 15, 2014, reiterating her July conversation with Hemmen about St. Paul's struggles with automating production records.[296] Tuckwell goes on to say that in August she offered to provide a demonstration of inTEAM's product, once

---

[293]  JX 234.

[294]  *Id.*

[295]  *Id.*

[296]  JX 248.

again, as an "alternative" to the WebSMARTT system.[297] Tuckwell then forwards this e-mail to Hughes, who forwards it to Goodman, stating that Hemmen is leaving St. Paul, and this is a positive development since Hemmen was blocking inTEAM's efforts in this regard. Further, she applauds Tuckwell to Goodman for her efforts of continuing to "push [St. Paul] to use [inTEAM's] tools."[298]

The Consulting Agreement prohibits Goodman from directly or indirectly, on behalf of himself or any other entity, "encourag[ing] or attempt[ing] to encourage any Customer of Heartland to terminate, or materially and adversely modify, its relationship with Heartland or to cease or refrain from doing business with Heartland."[299] Customer is defined as any current or prospective customers, clients, vendors, and suppliers of either SL-Tech prior to closing or Heartland.[300] The Customer must be someone "with whom the Consultant worked, or about whose business or needs the Consultant gained information, either in his capacity as an officer with [SL-Tech], or in his capacity as a Consultant [for Heartland]."[301] Thus, any direct or indirect solicitation by Goodman that attempted to affect

---

[297]     *Id.*

[298]     *Id.*

[299]     Consulting Agreement ¶ 11(b).

[300]     *Id.*

[301]     *Id.*

adversely an existing customer's relationship with Heartland would breach the Consulting Agreement, regardless of whether Goodman sought to provide Competitive Products and Services or a Competitive Business.

Importantly, Goodman does not attempt to rebut the facts that St. Paul is a customer of Heartland, that St. Paul was a customer of SL-Tech while he was CEO, that Tuckwell or Hughes work for him, that Tuckwell was marketing inTEAM's products as an "alternative" to WebSMARTT, that Goodman was aware of an opportunity at St. Paul, or that he was proactively discussing with his employees attempts to offer inTEAM as an "alternative" to WebSMARTT.[302] Instead, Goodman argues that inTEAM was merely "help[ing] out a consulting client" and that "inTEAM had every right to market that product to the St. Paul [P]ublic [S]chools."[303] What Goodman's argument fails to consider is that by allowing his employees to market this product as an "alternative" to WebSMARTT, he indirectly is involved in attempting to encourage St. Paul to modify or alter its relationship with Heartland by replacing WebSMARTT with inTEAM's products. The language in the non-solicitation provision prohibits any attempts to get customers to materially or adversely "modify" their relationship with Heartland. Goodman encouraged, or at the very least implicitly condoned,

---

[302]    Tr. 240-44.

[303]    *Id.* at 244.

77

inTEAM employees' efforts to persuade a Heartland customer to use inTEAM products as an alternative to WebSMARTT.

Goodman attempts to assert multiple defenses against Heartland's ability to bring these claims—namely, laches, acquiescence, waiver/estoppel, unclean hands, and prior material breach of contract. While I agree that there is "evidence establishing that [Heartland] has long been aware that inTEAM developed and sold software with the functions [Heartland] now alleges are wrongfully competitive,"[304] I need not analyze individually the affirmative defenses because each focuses on whether inTEAM's business as currently conducted violates the various non-competition provisions. Here, Goodman has breached the second clause of the non-solicitation provision, which is not dependant on and does not relate to the definition of the inTEAM Business. Instead, it precludes Goodman from encouraging any customer of Heartland to change adversely its relationship with Heartland. Thus, Goodman has not argued that any of the affirmative defenses specifically apply to this clause of the non-solicitation provision. Additionally, no facts in the record support the application of any of the affirmative defenses to the non-solicitation clause of the Consulting Agreement.

---

[304] Pl.'s Answering Br. 45; *see* JX 425; Tr. 1177 (Roberts).

## H.    Remedies

In awarding relief, this Court "has broad flexibility and discretion."[305]  The Court also must "put in place a balanced remedy that is equitable and reasonably tailored to address the precise nature of the misconduct at issue."[306]  In the context of violations of restrictive covenants, this Court has awarded both injunctive and monetary relief.[307]  To obtain an injunction, the plaintiff must show "(1) actual success on the merits, (2) irreparable harm, and (3) that the balance of the equities weighs in favor of issuing the injunction."[308]  With respect to damages, "[t]he law does not require certainty in the award of damages where a wrong has been proven and injury established."[309]  "[W]hen a contract is breached, expectation damages

---

[305]    DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 12.01(a) (2014).

[306]    *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *24 (Del. Ch. Feb. 18, 2010).

[307]    *See, e.g.*, *Concord Steel, Inc. v. Wilmington Steel Processing Co.,* 2009 WL 3161643, at *14-17 (Del. Ch. Sept. 30, 2009) (awarding money damages, injunctive relief, and attorney's fees for breach of a non-competition covenant).

[308]    *Concord Steel*, 2009 WL 3161643, at *18.

[309]    *Red Sail Easter Ltd. P'rs, L.P. v. Radio City Music Hall Prods., Inc.*, 1992 WL 251380, at *7 (Del. Ch. Sept. 29, 1992).

can be established as long as the plaintiff can prove the fact of damages with reasonable certainty. The amount of damages can be an estimate."[310]

### 1. inTEAM is entitled to an injunction

inTEAM seeks an injunction ordering Heartland "and its agents, representatives and any persons in active concert or participation with them (including Colyar) from competing directly or indirectly with the 'inTEAM Business,' which includes DST's 'unique state value added functionality' as defined in Exhibit C to the CMA."[311] As discussed above, inTEAM has proven actual success on the merits by showing that Heartland breached the non-competition agreement in Section 9.1.1 of the Co-Marketing Agreement.

Delaware law recognizes the uncertainty of what "could have been" had the non-competition agreement been honored and, thus, has consistently found a threat of irreparable injury in circumstances where a covenant not to compete is breached. Measuring the effects of breaches like this involves a costly process of educated guesswork with no real pretense of accuracy. This court has been candid

---

[310] *SIGA Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1111 (Del. 2015).

[311] Pl.'s Opening Br. 63.

to admit this reality and to use injunctive relief as the principal tool of enforcing covenants not to compete.[312]

Here, it is unknowable whether inTEAM would have gained more business, such as that from the Texas Department of Agriculture, had Heartland not improperly competed with inTEAM. Thus, the irreparable harm prong is met.

Finally, the equities favor injunctive relief as Heartland agreed not to pursue certain types of actions in the Co-Marketing Agreement, specifically, providing integrated administrative review and menu planning services to state agencies. And, inTEAM will continue to suffer the specific type of harm it sought to protect against in signing reciprocal non-competition clauses if Heartland is allowed to continue engaging in this behavior.

Heartland's breach began on March 17, 2014, when the relationship with Colyar first began, and ran until September 8, 2015, when Heartland announced Texas had not selected its proposal with Colyar.[313] This totals almost eighteen months of breach. Thus, I find the appropriate remedy is to extend the non-competition agreement from September 30, 2016 to March 21, 2018 in order to give inTEAM the full benefit of its bargain.

---

[312] *Hough Assocs. Inc. v. Hill*, 2007 WL 148751, at \*18 (Del. Ch. Jan. 17, 2007) (footnotes omitted).

[313] JX 295; JX 203; Tr. 1162 (Roberts).

## 2. inTEAM is not entitled to costs and fees

The Co-Marketing Agreement states that "if a court of competent jurisdiction . . . determines that either Party has breached this Agreement, then the breaching Party shall be liable and pay to the non-breaching Party the reasonable and verifiable legal fees and costs incurred in connection with such litigation or proceeding."[314] The Co-Marketing Agreement, however, limits the amount of any monetary payments by a breaching party to "not exceed the Fees previously paid by the other Party."[315] The provisions state further that these limitations "shall not apply with respect to (A) damages caused by the willful misconduct of the other Party; (B) damages resulting from a Party's breach of its confidentiality obligations . . . or (C) Losses that are the subject of indemnification . . ."[316] inTEAM does not rebut the fact that inTEAM has not paid Heartland any fees under the Co-Marketing Agreement, and inTEAM does not argue that any of the exceptions to the limitation under Section 11.3 apply. Therefore, inTEAM is not entitled to any costs and fees pursuant to the limitation in Section 11.2 of the Co-Marketing Agreement.

---

[314]    Co-Marketing Agreement § 6.5.

[315]    *Id.* § 11.2.

[316]    *Id.* §11.3.

82

### 3.    Heartland is entitled to an injunction

Section 11(e) of the Consulting Agreement states that "any violation or threatened violation of the provisions of Section 11 by the Consultant would cause Heartland irreparable harm, and the Consultant agrees that Heartland shall be entitled, in addition to any other right or remedy it may have at law or in equity, to an injunction."[317]  Heartland contends that in order to receive the full benefit if its bargain, the Court should tack on the amount of time from the beginning of Goodman's breach in July 2014, to the end date of the agreement in September 2016, equaling two years and two months.[318]

Heartland has proven that Goodman breached Section 11(b) of the Consulting Agreement from July 24, 2014 until December 15, 2014, totaling almost five months.  Essentially, Heartland only received four-and-a-half years of non-solicitation, rather than the five it bargained for.  The parties concede that under the Consulting Agreement, "any violation or threatened violation of the provisions of Section 11 by the Consultant would cause Heartland irreparable

---

[317]    Consulting Agreement ¶ 11(e).

[318]    Def.'s Opening Br. 51; *see also* Consulting Agreement ¶ 11(f) ("Consultant agrees that the time periods referenced [in the operative provisions] shall not include any period(s) of violation or period(s) of time required for litigation to enforce the covenants set forth herein.").

harm."[319]  In balancing the equities in this case, I find Heartland is entitled to an injunction against Goodman continuing the second clause of the non-solicitation provision for six months beginning September 30, 2016, and ending March 22, 2017.

### 4. Heartland is entitled to damages

Section 3 of the Consulting Agreement states that "[i]n the event the Consultant breaches Sections 7, 8, 9, 10, or 11 of this Agreement, Heartland shall have no obligation to pay the Consultant any compensation set forth herein."[320] Heartland argues Goodman should disgorge all compensation he received, totaling $600,000, along with pre- and post-judgment interest.[321]  Heartland continued paying Goodman fees in July, August, and September 2014, all while Goodman was breaching the non-solicitation provision.  Pursuant to the Consulting Agreement, Goodman lost his entitlement to those fees as soon as he began

---

319  Consulting Agreement ¶ 11(e); *see Hough Assocs. Inc. v. Hill*, 2007 WL 148751, at \*18 (Del. Ch. Jan. 17, 2007) ("[T]he Non-Competition Agreement should be enforced according to its plain terms, which in this case, specify that Hill's breach would, by definition, cause irreparable harm to Hough and justify the entry of an injunction against him.  No one has to sign a contract with such a provision, but when one does, he should not complain if the terms are given effect.").

320  Consulting Agreement ¶ 3.

321  Def.'s Opening Br. 51-52.

breaching.[322]  The agreement, however, does not state that Goodman must return the fees he was entitled to before the breach occurred.  Hence, I find that Goodman must disgorge any consulting fees paid in July, August, and September 2014, totaling $50,003.01.

## III.  CONCLUSION

For the foregoing reasons, I find in favor of inTEAM on its non-competition claims against Heartland and against Heartland on all its claims against inTEAM. Heartland shall be enjoined for a period of approximately eighteen months from "engag[ing], directly or indirectly, on its own behalf or as a principal or representative of any person, in providing any services or products competitive with the inTEAM Business."[323]

I also find in favor of Heartland and against Goodman for breach of the second clause of the non-solicitation provision in the Consulting Agreement. Goodman shall be enjoined for a period of approximately five months from "directly or indirectly, on behalf of himself or on behalf of any other person, firm or business entity . . . encourag[ing] or attempt[ing] to encourage any Customer of Heartland to terminate, or materially and adversely modify, its relationship with

---

[322]  Consulting Agreement ¶ 3 (stating in the event of breach, Heartland has "no obligation to pay the Consultant any compensation").

[323]  Co-Marketing Agreement § 9.1.1.

Heartland or to cease or refrain from doing business with Heartland."[324]  Goodman also shall disgorge $50,003.01 in consulting fees.

The parties shall submit a joint conforming final judgment within ten days.

**IT IS SO ORDERED**.

---

[324]    Consulting Agreement ¶ 11(b).